IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALBERT ADAMCYK,

          Plaintiff,

v.

STEVEN BOWMAN,
WEXFORD HEALTH SOURCES, INC.,
CHRISTINE VINYARD,
DOCTOR SHAH,
DOCTOR LARSON,
PERCY MYERS,
DOCTOR CALDWELL,
JANE DOE 1,[1]
PAM SESSIONS, and
DANIEL MORGAN,

          Defendants.

Case No. 24-cv-02237-SPM

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

    Plaintiff Albert Adamcyk, an inmate of the Illinois Department of Corrections (IDOC), filed the instant lawsuit pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred at Centralia Correctional Center. The Complaint is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. Any portion of the Complaint that is legally frivolous, malicious, fails to state a claim for relief, or requests money damages from an immune defendant must be dismissed. 28 U.S.C. § 1915A(b).

### THE COMPLAINT

    In the Complaint, Plaintiff alleges that medical treatment for his carpal tunnel syndrome in both hands has been delayed and denied while at Centralia Correctional Center (Centralia). (Doc.

---

[1] Plaintiff refers to this individual in the Complaint as "Unknown Nurse." The Court will refer to her as Jane Doe 1.

1).

On August 24, 2020, Plaintiff was seen by Dr. Shah for nerve related pain and numbness in his right hand. (Doc. 1, p. 6). At the time, Plaintiff explained to Dr. Shah that about ten years previously, he had been tested for carpal tunnel syndrome (CTS) and the results were "borderline CTS." He also told Dr. Shah that his condition had become painful, but he was unable to go to "nurse sick call" because of the pandemic. Plaintiff asked if he could be seen by a hand specialist. (*Id.*). Dr. Shah told Plaintiff, "Wexford will never approve this type of surgery." (*Id.* at p. 6-7). Dr. Shah ordered x-rays for arthritis and a CTS brace for Plaintiff. (*Id.* at p. 7). The x-ray results showed no abnormalities in Plaintiff's right hand and "unremarkable right wrist and right thumb." (*Id.*).

On October 9, 2020, Plaintiff went to nurse sick call because the plastic of the CTS brace was cutting into his hand, causing additional pain and numbness. (Doc. 1, p. 7). On November 2, 2020, Dr. Pelegrin prescribed Plaintiff a new brace without plastic. Dr. Pelegrin recorded that as of December 6, 2020, Plaintiff had received his new brace. (*Id.*).

For the next year, Plaintiff continued to complain about pain and numbness in his hand "only to go on deaf ears." (Doc. 1, p. 7). His nurse sick call requests were cancelled many times. (*Id.*).

On November 13, 2021, Plaintiff went to nurse sick call for pain and numbness in his right hand. (Doc. 1, p. 7). He describes his pain as a level 6 out of 10 and states that his hand was throbbing and stabbing intermittently. (*Id.*).

On November 15, 2021, Plaintiff was burned while working in the kitchen. (Doc. 1, p. 8). He states that boiling hot water accidently poured on his right hand, which was gloved. Due to his CTS, he had a delayed reaction to the pain. By the time he realized that boiling water was pouring on his hand, he had incurred severe burns. When being treated by the nurse for the burns, Plaintiff

asked if he could receive a medical permit for a "lay-in." The nurse told Plaintiff to ask the kitchen supervisor. Plaintiff's supervisor told him that without a "lay-in" permit from the doctor, Plaintiff would lose his job and receive disciplinary action if he did not show up for work. (*Id.*).

By March 22, 2022, Plaintiff's hand symptoms had worsened. (Doc. 1, p. 8). The pain and numbness were spreading to all his fingers, and he had a pins and needles sensation in his hand. At nurse sick call, Plaintiff described his pain as a level 8 out of 10. Plaintiff told the nurse that his pain medication was ineffective. Plaintiff had an appointment on April 4, 2022, to see the doctor, but the appointment was canceled. (*Id.*).

On April 11, 2022, Plaintiff was seen by Physician Assistant Smith. (Doc. 1, p. 8). Smith evaluated Plaintiff's symptoms and ordered muscle rub. The rub was not helpful in treating Plaintiff's pain. It only decreased the swelling. (*Id.*).

On June 28, 2022, Plaintiff returned to nurse sick call and complained that his pain had reached a level 9 out of 10. (Doc. 1, p. 8). The nurse referred Plaintiff to the doctor and gave him ineffective pain medication. (*Id.*).

On July 27, 2022, Plaintiff was seen by a nurse practitioner for pain and numbness in his right hand. (Doc. 1, p. 8). The nurse practitioner examined Plaintiff and prescribed Voltaren, an arthritis medication. (*Id.*).

On August 22, 2022, Plaintiff injured his left hand while playing softball. (Doc. 1, p. 8). On September 19, 2022, he was seen by Dr. Myers for pain and numbness he was now experiencing in both hands. (*Id.* at p. 9). Dr. Myers ordered an x-ray for the left had but did nothing for Plaintiff's right hand. (*Id.*).

Plaintiff returned to nurse sick call on September 21, 2022, for pain in his hands. (Doc. 1, p. 9). Plaintiff was seen by Jane Doe 1. Jane Doe 1 sent Plaintiff back to his cell because two days before he had just been seen by Dr. Myers. (*Id.*).

On October 13, 2022, the pain in Plaintiff's right hand had reached a level 9.5 out of 10. (Doc. 1, p. 9). Plaintiff returned to nurse sick call. The nurse noted that Plaintiff had a "golf ball size" lump in the middle of his left hand, and he could not make a fist. The nurse gave Plaintiff a short supply of ibuprofen and referred him to the doctor. (*Id.*).

On October 23, 2022, Plaintiff had an appointment scheduled with the doctor. (Doc. 1, p. 9). Prior to the appointment, Plaintiff was told by Jane Doe 1 that the appointment was for Plaintiff's rash and "not for his hands." Plaintiff explained that the rash had already healed and that his hands were causing him a lot of pain. Jane Doe 1 told Plaintiff to return to his cell house, cancelled the appointment, and falsely recorded in the medical record that he refused to be seen. (*Id.* at p. 9-10).

Plaintiff was seen by Dr. Caldwell on November 3, 2022. (Doc. 1, p. 10). Plaintiff told Dr. Caldwell about his "borderline CTS" diagnosis ten years prior. Dr. Caldwell noticed the lump on Plaintiff's right hand and noted that Plaintiff was taking Voltaren. Dr. Caldwell did not refer Plaintiff to a specialist. (*Id.*).

On November 18, 2022, Plaintiff went to nurse sick call about the pain in his hands and numbness. (Doc. 1, p. 11). The nurse gave Plaintiff the same ineffective pain medication and referred Plaintiff to the doctor. On December 6, 2022, Plaintiff returned to nurse sick call, and the nurse noted swelling in both hands. She also noticed that the x-rays showed signs of arthritis and that the Voltaren was not helping with Plaintiff's pain. The next day, Plaintiff was called to see Dr. Caldwell. Dr. Caldwell referred Plaintiff to an outside hand specialist. (*Id.*).

On January 13, 2023, Plaintiff sent a "kite" to the healthcare unit administrator, Christine Vinyard, asking when he would be sent out for his evaluation with the hand specialist. (Doc. 1, p. 11). Vinyard did not respond until two months later stating, "Grievance #E23-3-64 sent to Wexford DON/SA in regards to scheduling." (*Id.*).

Plaintiff was seen by an orthopedic surgeon, Dr. Mulhern, on January 27, 2023, who diagnosed Plaintiff as needing carpal tunnel release surgery. (Doc. 1, p. 11). On February 27, 2023, Plaintiff wrote the healthcare unit asking for the date that the surgery was scheduled and was told that no appointment had been made. (*Id.*).

On March 30, 2023, Plaintiff was seen by a nurse practitioner, who prescribed him naproxen. (Doc. 1, p. 12). Plaintiff states that this medicine helped alleviate some of his pain. (*Id.*).

On April 12, 2023, Plaintiff again wrote the healthcare unit asking about his surgery. (Doc. 1, p. 12). Plaintiff received a response from Vinyard stating that she had sent the request to "Wexford schedules." On June 9, 2023, Plaintiff asked a nurse when his surgery was going to be scheduled, and the nurse told him that she was not allowed to tell him. (*Id.*).

Plaintiff saw Dr. Caldwell on June 14, 2023, for "hand pain arthritis." (Doc. 1, p. 12-13). Plaintiff asked for pain medication, and Dr. Caldwell would not give it to him. (*Id.*). On July 22, 2023, Plaintiff returned to nurse sick call because his pain was unbearable, and the pain medication he was taking was not helping. (*Id.* at p. 13). The nurse gave Plaintiff another short supply of ineffective pain medication. He went to nurse sick call again on August 28, 2023, for his pain. (*Id.*).

On September 11, 2023, Plaintiff was sent to see Dr. Mulhern for a pre-operation evaluation. (Doc. 1, p. 14). Dr. Mulhern recorded that Plaintiff needed surgery, as prescribed eight months previously, and gave Plaintiff a cortisone shot for his left hand. (*Id.*).

Plaintiff went to nurse sick call on September 17, 2023, for his constant hand pain. (Doc. 1, p.14). The nurse told Plaintiff that he could not be given pain medication before surgery. He went to nurse sick call again on September 30, 2023, for pain and was given a short supply of ibuprofen and Tylenol. At this point, Plaintiff asserts that his pain level was a 10 out of 10 and his hand felt like it was on fire. When he ran out of pain medicine, Plaintiff went back to nurse sick

call on October 2, 2023. (Doc. 1, p. 14). The nurse noticed "how swollen his right hand was." (*Id.*).

Plaintiff received surgery on his right hand on October 10, 2023. (Doc. 1, p. 14). Following the surgery, Plaintiff was housed in the infirmary at Centralia. Dr. Mulhern had prescribed Tylenol 3 for his pain for the first five days and then Tramadol as needed. The nurses at Centralia, however, only gave Plaintiff Tramadol, which was not as effective. (*Id.*).

Plaintiff had an appointment with Dr. Mulhern on October 23, 2023, to have his stitches removed. (Doc. 1, p. 15). During the appointment, Dr. Mulhern recommended caporal tunnel release surgery on Plaintiff's left hand. Dr. Mulhern did not give Plaintiff a cortisone shot because he wanted to perform surgery as soon as possible. (*Id.*).

At nurse sick call on November 30, 2023, Plaintiff asked about his surgery. (Doc. 1, p. 15). The nurse told Plaintiff that she would inquire with Pam Sessions to see if the referral had been processed. On December 6, 2023, Plaintiff was seen by Dr. Annora, at Centralia, for numbness he was still experiencing in his right hand. Dr. Annora prescribed Plaintiff's six months of Tylenol. Plaintiff, however, was only given a single month worth's of Tylenol and had to obtain another prescription in July 2024. (*Id.*).

Plaintiff asked about his surgery again at nurse sick call on December 30, 2023. (Doc. 1, p. 15). Plaintiff had surgery on his left hand on January 26, 2024. Dr. Mulher recommended that Plaintiff have six-month follow-up appointment after the surgery. (*Id.*). On July 2, 2024, Plaintiff wrote to Vinyard asking about the follow-up appointment. (*Id.* at p. 16). She responded that she was checking on his appointment "and/or injection," and asked "We can release your medical hold if you do not want to pursue this follow-up." Plaintiff responded that he did not want to "release the medical hold" because he was still having issues with his left hand and experiencing pain in the center of his left hand. (*Id.*).

As of writing the Complaint on September 27, 2024, Plaintiff had still not received a

follow-up appointment with Dr. Mulhern. (Doc. 1, p. 16). Plaintiff states that the numbness he is experiencing is permanent due to the delay in receiving surgery. (*Id.*).

## DISCUSSION

Based on Plaintiff's allegations and his articulation of his claims, the Court designates the following counts:

> **Count 1:** Eighth Amendment claim against Wexford Health Sources, Inc., Bowman, Vinyard, Shah, Larson, Myers, Caldwell, Jane Doe 1, Sessions, and Morgan for deliberate indifference to Plaintiff's serious medical needs concerning carpal tunnel syndrome in both hands and associated symptoms.
>
> **Count 2:** State law negligence claim against Defendants.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly*[2] pleading standard.**

## Count 1

To state a claim for deliberate indifference, an inmate must put forward facts implicating both an "objective and subjective element, namely that: (1) an objectively serious medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it." See *Chapman v. Keltner*, 241 F.3d 842, 845 (citing *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999)). Deliberate indifference is a high bar. "Neither negligence nor even gross negligence is sufficient basis for liability; rather, liability attaches only if the conduct is intentional or criminally reckless." *Id.* (citing *Salazar v. City of Chi.,*

---

[2] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This includes dismissal of any claims Plaintiff is intending to bring against individuals who are named in the statement of claim but not identified as defendants in the case caption. The Court will not treat parties not listed in the caption as defendants. *See Myles v. United States*, 416 F.3d 551, 551–52 (7th Cir. 2005).

940 F. 2d 233, 238 (7th Cir. 1991)). Furthermore, when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs, courts should consider the totality of the received medical care. See *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

Count 1 shall proceed against Dr. Shah. According to the Complaint, Dr. Shah only treated Plaintiff on one occasion, on August 24, 2020, and during his encounter with Plaintiff ordered x-rays and a wrist brace. (Doc. 1, p. 6). Plaintiff alleges that Dr. Shah refused to refer him to a specialist, however, because "Wexford will never approve this type of surgery." Therefore, it can reasonably be inferred that Dr. Shah's treatment decisions were not based on medical judgment, but a policy of Wexford Health Sources, Inc. (Wexford). See *Arnett v. Webster*, 658 F.3d, 751 (7th Cir. 2011) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008))

Count 1 will proceed against Dr. Myers, Jane Doe 1, and Dr. Caldwell. Plaintiff claims that these individuals either denied Plaintiff treatment, continued with ineffective treatment, and/or delayed treatment for his carpal tunnel syndrome and associated symptoms.

Count 1 will proceed against Sessions and Vinyard for failing to timely schedule Plaintiff's surgeries and follow-up appointments with Dr. Mulhern, causing or contributing to Plaintiff's delayed care.

Count 1 will proceed against Wexford. Plaintiff claims that Wexford has implement several practices and policies in order to "defuse," which the Court construes to mean limit or reduce, medical care provided to inmates in order to save money. These various practices resulted in Plaintiff not receiving constitutionally adequate medical care for his carpal tunnel syndrome and associated symptoms, particularly his pain - such practices include (1) failing to timely authorize treatment and surgeries with outside providers; (2) requiring a inmate to go to nurse sick call more than once within a thirty day period before he can be seen by a doctor; (3) training nurses to only see an inmate for the issue listed on the request slip, regardless of inmate's current condition and

medical treatment needed at the time of the appointment; (4) not hiring an adequate number of doctors to work at Centralia; (5) having inmates treated by different medical providers causing fragmented, needlessly repeated, and delayed medical care; and (6) limiting nurses and providers to only providing certain types of pain medicine regardless of the efficacy.

Count 1 is dismissed as to Dr. Larson for prescribing Plaintiff Tramadol following his surgery on October 23, 2023. Plaintiff states that instead of providing him Tylenol 3 following his carpal tunnel surgery on his right hand, as recommended by the surgeon, Dr. Larson ordered Tramadol, which Plaintiff believes is less effective. (Doc. 1, p. 14). Plaintiff's dissatisfaction with the pain medication and treatment decision chosen by Dr. Larson on this single occasion, however, does not state a claim for deliberate indifference. There is nothing to suggest that Dr. Larson knew that Plaintiff's pain following surgery was not being properly address by the Tramadol and ignored the complaints. Additionally, the mere difference of opinion between Dr. Mulhern and Dr. Larson in treating Plaintiff's pain is not sufficient for the Court to infer that Dr. Larson's conduct amounted to a disregard to a substantial risk of harm. *See Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). "There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field," *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008), and Plaintiff is "not entitled to demand specific care." *Walker v. Wexford Health Sources, Inc.*, 940 F. 3d 954, 965 (7th Cir. 2019) (quoting *Zacker v. Mesrobian*, 299 F. App'x 598, 601-02 (7th Cir. 2008)).

Plaintiff also claims that Dr. Larson failed to refer him to an outside physician. (Doc. 1, p. 17). However, other than the incident with Plaintiff's pain medication following surgery on his right hand, Plaintiff does not include any factual details supporting the plausible inference that Dr. Larson knew that Plaintiff had a serious medical need that he was not receiving proper care. Accordingly, Count 1 is dismissed as to Dr. Larson.

The Court dismisses all claims relating to the "Utilization Management," composed of Steven Bowman, Percy Myers, Christine Vinyard, and Larson. (Doc. 1, p. 13, 16). Plaintiff claims that this group of people "get together in order to decide what medical issues will be approved or not." (*Id.* at p. 13). He asserts that the Utilization Management find ways to "defuse" medical care for individuals in custody. (*Id.* at p. 16). Other than these conclusory allegations, it is not clear what, if any, involvement this group and its members had specifically in his medical care and the approval or denial of recommended treatments. Any constitutional claims Plaintiff is attempting to bring against Bowman, Myers, Vinyard, and Larson for conduct performed as members of the Utilization Management group are dismissed.

In addition to being part of the Utilization Management group, Plaintiff asserts that Bowman, the medical director for IDOC, followed the Wexford policy aimed at limiting and reducing referrals to outside physicians. (Doc. 1, p. 17). Plaintiff sues Bowman in both his official and individual capacities. To the extent Plaintiff is suing Bowman in his individual capacity for monetary damages under Section 1983, such claim is dismissed. Pursuant to Section 1983, "a government official is only liable for his or her own misconduct," *Perez v. Fenoglio,* 792 F. 3d 768, 781 (7th Cir. 2015), and supervisory officials cannot be held liable simply because they oversee operations and employees within IDOC. There is nothing in the Complaint to allow the plausibly infer that Bowman had any knowledge of the constitutional deprivations that Plaintiff was facing, that Bowman was personally involved in Plaintiff's medical care in anyway, or that the alleged Wexford practice of delaying and limiting outside referrals was so pervasive that Bowman would have been aware of the policy. *See Vance v. Peters,* 97 F. 3d 987, 992 (7th Cir. 1996). *Gossmeyer v. McDonald,* 128 F. 3d 481, 495 (7th Cir. 1997) ("Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not personally involved."); *Smith v. Sangamon Cnty. Sherriff's Dep't,* 715 F.3d 188, 192 (7th Cir. 2013). Count 1 is therefore

dismissed as to Bowman in his individual capacity.

Because Plaintiff claims his medical care is still being delayed and seeks injunctive relief, Bowman will remain a defendant in his official capacity for the purposes of implementing any injunctive relief that may be ordered. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (state officials may be sued in their official capacities when "the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.").

Count 1 is dismissed as to Counselor Morgan. Plaintiff asserts that Morgan failed to follow proper protocol in answering his grievance in a timely manner and that the delayed grievance response caused Plaintiff's surgery to be delayed. (Doc. 1, p. 11). Simply ruling against a prisoner on an administrative complaint or mishandling a grievance does not cause or contribute to a constitutional violation. *See George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007).

**Count 2**

In Illinois, in order to state a claim for negligence, a complaint must allege facts to establish that the defendant owed the plaintiff a duty of care, breached that duty, and that the breach was the proximate cause of the plaintiff's injury. *Thompson v. Gordon*, 948 N.E.2d 39, 45 (Ill. 2011) (citing *Iseberg v. Gross*, 879 N.E.2d 278 (2007)).

Other than stating that he is bringing a "state-tort claim of negligence," Plaintiff provides no further explanation for this claim. (Doc. 1, p. 1). Conclusory statements, such as this one pertaining to negligence, do not meet the pleading standards set forth in *Twombly* and Federal Rule of Civil Procedure 8. *See Twombly,* 550 U.S. at 555; *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (the court is not required to accept as true "legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."). Accordingly, Count 2 shall be dismissed.

#### MOTION FOR SERVICE OF PROCESS AT GOVERNMENT EXPENSE

Because Plaintiff has been granted pauper status (Doc. 7) and the Court is obligated to arrange service for incarcerated persons proceeding *in forma pauperis*, his Motion for Service of Process at Government Expense (Doc. 3) is **DENIED** as moot.

#### MOTION TO CLARIFY

Plaintiff's Motion to Clarify and Correct is **GRANTED.** (Doc. 6). The spelling of Plaintiff's last name has been corrected on the docket. The Clerk of Court is **DIRECTED** to correct the docket so that the lead defendant is Wexford Health Sources, Inc., and once corrected, the Clerk shall send Plaintiff a copy of the docket sheet.

#### OFFICIAL CAPACITY CLAIMS

Plaintiff states that he is suing Bowman, Wexford, Vinyard, Myers, and Sessions in their individual and official capacities. (Doc. 1, p. 2-4). Wexford can only be held liable as a corporation in its official capacity, so the individual capacity claims against Wexford are **DISMISSED**. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Furthermore, a suit against a defendant in his or her official capacity is equivalent to a suit against the entity that employs that defendant. Here, those entities are IDOC and Wexford. As Plaintiff is already proceeding against Wexford and Bowman, in their official capacities, any official capacity claims against other employees of IDOC and Wexford would be redundant. Accordingly, the official capacity claims against Vinyard, Myers, and Sessions are **DISMISSED**.

#### DISPOSITION

For the reasons stated above, the Complaint survives preliminary review pursuant to Section 1915A. **COUNT 1** shall proceed against Wexford, Vinyard, Shah, Myers, Caldwell, Jane Doe 1, and Sessions and is **DISMISSED** against Bowman, Larson, and Morgan. Bowman **SHALL REMAIN** a defendant in his official capacity only for the purpose of implementing any

injunctive relief that may be ordered. Because there are no surviving claims against Larson and Morgan, the Clerk of Court is **DIRECTED** to terminate them as parties on the docket.

The Clerk of Court is further **DIRECTED** to **ENTER** the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.

The Clerk of Court **SHALL** prepare for Wexford, Bowman (official capacity only), Vinyard, Shah, Myers, Caldwell, Jane Doe 1 (once identified), and Sessions the following: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each defendant's place of employment. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the defendant, and the Court will require the defendant pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, his last known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, the Defendants need only to respond to the issues stated in this Merit Review Order.**

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not

independently investigate his whereabouts. This shall be done in writing and not later than 14 days after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: January 16, 2025**

        *s/Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**United States District Judge**

### NOTICE TO PLAINTIFF

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take **90 days** or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.